UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>JEAN MARRERO-BURGOS,<br>Defendant. | Criminal No. 19-803(FAB) |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, through its undersigned counsel, respectfully submits this sentencing memorandum in support of a total sentence of imprisonment of **90 months** with a supervised release term of five years to follow.

I. The Offense Conduct

On December 12, 2019, Puerto Rico Police officers and Bayamon Municipal officers were doing a joint patrol at Urb. Cana when they saw two individuals and noticed that one was holding a firearm. The individuals ran into a house and the officers chased after them in hot pursuit. *See* PSR at ¶¶ 8-11.

As the agents entered, they encountered Defendant and another armed individual in a bedroom inside the house. *Id.* at ¶ 11. Defendant tossed a firearm (a loaded Glock pistol, model 22, .40 caliber, bearing serial number NBM742, with an attached high-capacity magazine) and ran out the back but he was eventually arrested. *Id.* at ¶¶ 11-12.

In the bedroom where the agent first encountered Defendant, the agents also found drug ledgers, drug paraphernalia, 572 rounds of 5.56 caliber ammunition inside a red bag, and distribution amounts of marijuana. *Id.* at ¶ 12.



The seized Glock pistol had an attached, clear-colored, conversion device that allowed it to fire automatically, more than one round, with a single function of the trigger.



On top of a small table, agents found cocaine and paraphernalia along with Defendant's identification.





II. <u>Defendant's phone extraction</u>

"The fact a defendant "saved numerous photographs (some including him) of firearms, drugs, and drug paraphernalia, or had been sent such photographs on WhatsApp, signaled his past participation in or propensity for illegal or violent activities involving drugs and firearms" and conveys information relevant to a sentence related to firearms. *United States v. Viloria-Sepulveda*, 921 F.3d 5, 9 (1st Cir. 2019). Evidence associating defendant with drugs and firearms is "evidence of relevant history and characteristics." *Id.* at 10.

Attached hereto is a report with some images obtained from Defendant's phone extraction. Exhibit 1. The reports shows that the phone contained multiple images depicting firearms and controlled substances. Among the pictures found within the phone is the one below which is similar to the findings of the officers at the time of Defendant's arrest.



*See* Exhibit 1 at # 23.

5 | P a g e

Within the phone, there were also several relevant videos. *See* Exhibit 2.  In one of the videos, Defendant is heard talking about whether the substance is "pure".



*See* Exhibit 2 at # 10 and Exhibit 3.

> Look, baby. This here. This is good. This over here. This here, baby. This powder over here. That, that, that, that's not pure. I checked this one and it's good. This is what it's not pure, fag. However, you can even see it in the color. This been tampered. This is for the kitchen. You know, baby?

In other videos, he is in possession of a firearm with the same characteristics as the machinegun seized. In one of these videos, Defendant, while lying in bed, says that "not event to sleep" [he lets go of the firearm].



*See* Exhibit 2 at # 5 and Exhibit 4.

> Not even to sleep, motherfucker. What do you think? Hahahaha. Dang.

In yet another video, he describes the firearm to include the model (22) and its automatic capabilities.



See Exhibit 2 at # 3 and Exhibit 5.

> [C/O] This is the one I have. Look. This bitch. Full [auto]. Look. Woop. Full [auto]. The clear chip. Look at it. 22. Third edition. The fucker is new, new, new. Doesn't even have a scratch. Look.

The appearance and description of the firearm in the video are consistent with the firearm seized.

8 | P a g e

Another video shows the same red bag full of ammunition that was seized at the time of Defendant's arrest.



*See* Exhibit 2 at # 4.

Finally, despite having reported no recent employment, assets, or source of income,[1] Defendant's phone also contains a video in which is brags about having cash to spend on drinks during the weekend.



*See* Exhibit 2 at # 11.

III. Defendant's background and characteristics

Defendant is 26 years old and generally healthy. ECF No. 77 at p 2, ¶¶ 50-51. He is single without any dependents. *Id.* at ¶ 48. He reported a good relationship with his relatives and there are no reports of traumatic events. *Id.* at ¶¶ 46-47. He completed high school through a GED program. *Id.* at ¶ 53. He reported doing some odd jobs in 2018. *Id.* at ¶ 54. Prior to that, he was employed for a year in 2014. *Id.*

While no criminal history points were adjudicated, this is not Defendant's first brush with the law. Defendant volunteered a juvenile adjudication for committing a robbery with a toy gun and that he violated the conditions imposed by testing positive to drugs. *Id.* at ¶ 38. Additionally, at age 19, he benefited from a Drug Diversion Program. *Id.* at ¶ 39. Later, he was arrested and

---

[1] *See* PSR at ¶¶ 54-55.

charged with another robbery and firearm charges, but the charges were dismissed under Rule 64(n) (speedy trial). *Id.* at ¶ 44. No probable cause was found as to another arrest. *Id.* at ¶ 45.

While detained for the instant offense, Defendant incurred in a disciplinary violation by possessing a cellular phone. *Id.* at ¶ 20.

IV. <u>Nature and Circumstances of the Offense</u>

Drugs and gun violence are inextricably intertwined. *See United States v. Caggiano*, 899 F.2d 99, 103 (1st Cir. 1990) ("[F]irearms are one of the tools of the trade of drug dealers. Guns, like glassine bags, scales and cutting equipment are an expected and usual accessory of the narcotics trade."); *United States v. Hinds*, 856 F.2d 438, 443 (1st Cir. 1988) ("We have only to read the daily newspapers or watch the news on television to recognize that narcotic dealing and guns go hand in hand."). But, Defendant did not possess a revolver or a semi-automatic handgun in furtherance of his drug trafficking activities. He possessed a pistol modified to function as a machinegun.

> Machineguns have become the weapons of choice for those involved in drug trafficking.
>
>> "'[M]achine guns . . . are primarily weapons of war and have no appropriate sporting use or use for personal protection.'" *United States v. Jennings,* 195 F.3d 795, 799 n. 4 (5th Cir. 1999) (quoting S. Rep No. 90–1501, at 28 (1968)). "A modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds." *U.S. v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012). "Outside of a few government-related uses, machine guns largely exist on the black market." *Id.* at 640. They are "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime."

*H.R. Rep.* No. 495, 99th Cong., 2d Sess., 2, 4 (1986), reprinted in 1986 U.S.C.C.A.N. 1327, 1330.

In a recent trial, an FBI firearms expert explained her experience test-firing the Glock pistol that was modified to be fully automatic: "I can't fire something like this in the water tank because

of muzzle rise. That means, if it does go full auto, the firing will kick back, and it will keep getting higher and higher…" *United States v. Polaco-Hance*, 20-cr-313-FAB, Dkt. No. 101 at 87:22-25 (testimony of Aimee Qulia, forensic examiner of FBI Laboratory in the Firearms and Toolmarks Unit). Moreover, techniques that could be used to stabilize the recoil and muzzle rise from a military machinegun are not present in a pistol modified to become a machinegun. *See e.g. Heavy Machine Gun M2 Series*, Department of the Army at pp. 6-7 to 6-9 (May 19, 2017) (available at https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/ARN5846_TC%203-22x50%20FINAL%20WEB.pdf). These are not present in Glock machineguns.

Machineguns, of any type, are extremely dangerous. But machineguns that the user is less able to control and that risk spraying, indiscriminately, a large volume of bullets in seconds are deadlier.

In light of the above, the United States recommends a sentence of 72 months as to Count Two and 18 months as to Count Three.

V.      Community-based factors

The First Circuit has recognized the value of community-based factors in fixing a sentence. *See, e.g., United States v. Flores-Machicote*, 706 F.3d 16, 23 (1st Cir. 2013) ("[T]he incidence of particular crimes in the relevant community appropriately informs and contextualizes the relevant need for deterrence."). In imposing its sentence, this Court may take in consideration the problem of gun violence in Puerto Rico. *See, e.g., Viloria-Sepulveda*, 921 F.3d at 10 ("The pervasiveness of guns and the level of violence in the local community are connected to the determinations that a sentencing judge must make under § 3553(a)(2)").

The First Circuit has acknowledged the seriousness of gun-related violence in this District. *See United States v. Narvaez-Soto*, 773 F.3d 282, 286 (1st Cir. 2014) (describing "the [district]

court's reasoned determination, predicated on its experience, that the incidence of violent crime—and, particularly, gun-related violent crime—is an acute problem in Puerto Rico"). Indeed, there is no doubt that "Puerto Rico is a hot spot for weapons." *Viloria-Sepulveda*, 921 F.3d 5 at 10.

This Court is well aware of the drug trafficking machinegun problems in Puerto Rico. According to preliminary data from the PRPB, in 2021, drugs are the leading cause of murders followed by vengeance (some of which may very well be also related to drug trafficking as well).



In 2020, firearm offenses constituted 11.7% of federal offenses prosecuted nationwide; they constituted 18.8% of offenses prosecuted in the District of Puerto Rico. Drug Trafficking, with the violence it generates, is also particularly problematic in our District. In 2020, Drugs accounted for 47.2% of the offenses prosecuted in our District. This is almost double the National ratio of 26.1%.



*See* U.S. Sent'g Comm., *Statistical Information Packet*, Fiscal Year 2020, District of Puerto Rico (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/pr20.pdf).

Puerto Rico has faced—and continues to face—a pandemic of armed, violent crime. In 2017, Puerto Rico had 20.3 murders per 100,000; in 2018, it was 20 murders per 100,000; in 2019, it was 19 murders per 100,000. Comparatively, the United States averaged approximately 5.0 murders per 100,000—put another way, in 2018 and 2019, Puerto Rico averaged 400% more murders per 100,000 people than the United States.

"The main mechanism of all violent deaths in Puerto Rico were the use of firearms." *Violent Deaths in Puerto Rico 2018* at p. 17, Puerto Rico Institute of Statistics.[2] This is a long-term trend. "Data from the Bureau of Forensic Sciences from 2000 to 2016, reflect that the use of firearms to inflict a fatal injury has increased from 83.8% in men and 54.1% in women in 2000, to 91.5% in men and 67.9% in women in 2016. Data from the Puerto Rico Violent Death Reporting System (PRVDRS) for 2018 show that firearms continue to be the main mechanism for homicides in both men (91.6%) and women (76.9%)." *Id.* at p. 28.

According to a recent presentation from the Puerto Rico Institute of Statistics, in 2019, Puerto Rico had the highest incidence of murder (male victims) within the United States (adjusted for population). *See* Exhibit 6.

**Estados/Territorios con las mayores tasas de homicidios en 2019**
*States/Territories with highest rates of homicides in 2019*

Hombres / Men

| State/Territory | Number of Deaths | Population | Crude Rate | Age-Adjusted Rate* |
|---|---|---|---|---|
| **Puerto Rico** | **590** | **1,515,598** | **38.9** | **40.9** |
| District of Columbia | 113 | 334,711 | 33.8 | 30.5 |
| Louisiana | 494 | 2,267,050 | 21.8 | 22.3 |
| Alabama | 451 | 2,369,517 | 19.0 | 20.1 |
| South Carolina | 404 | 2,493,139 | 16.2 | 17.0 |
| New Mexico | 167 | 1,037,432 | 16.1 | 16.9 |
| Maryland | 465 | 2,928,865 | 15.9 | 16.2 |
| Missouri | 460 | 3,012,662 | 15.3 | 15.7 |
| Alaska | 48 | 381,418 | 12.6 | 13.4 |
| Illinois | 699 | 5,595,664 | 12.5 | 12.6 |

Mujeres/ Women

| State/Territory | Number of Deaths | Population | Crude Rate | Age-Adjusted Rate* |
|---|---|---|---|---|
| Alaska | 30 | 350,127 | 8.6 | 8.3 |
| Louisiana | 118 | 2,381,744 | 5.0 | 5.3 |
| New Mexico | 50 | 1,059,397 | 4.7 | 5.3 |
| Alabama | 108 | 2,533,668 | 4.3 | 4.6 |
| Missouri | 130 | 3,124,766 | 4.2 | 4.5 |
| Oklahoma | 75 | 1,996,313 | 3.8 | 3.9 |
| West Virginia | 32 | 904,377 | 3.5 | 3.9 |
| South Carolina | 96 | 2,655,575 | 3.6 | 3.8 |
| Georgia | 168 | 5,456,999 | 3.1 | 3.1 |
| **Puerto Rico** | **41** | **1,677,955** | **2.4** | **2.8** |

* U.S. Standard Population 2000 (all races, both sexes)

---

[2] Available at
https://estadisticas.pr/files/Publicaciones/Informe%20Muertes%20Violentas%202018_FINAL.11.30.21.pdf

14 | P a g e

Likewise, Puerto Rico had the highest proportion of male victims murdered by firearm violence. *Id.*



Murder rates were even higher in 2021. Even with the restrictions imposed to address the health concerns created by the COVID-19 pandemic, there were 529 murders in 2020. In 2021, the number rose beyond those reported in 2018 and 2019 with a total of 616 murders reported.[3]

The prevalence of gun violence in Puerto Rico, analyzed together with the circumstances of the offense and defendant's characteristics, supports sentencing Defendant to **90 months** of imprisonment.

VI.     The need to protect the public for further crimes by the defendant

The need to protect the public from further crimes of the defendant also supports a total sentence of **90 months**.

---

[3] *See* https://estadisticas.pr/en/estadisticas-mas-recientes?type=delitos_tipo_i

According to a study by the United States Sentencing Commission[4], firearms offenders recidivated at a higher rate than non-firearms offenders. This study also found:

- "Over two-thirds (68.1%) of firearms offenders were rearrested for a new crime during the eight-year follow-up period compared to less than half of non-firearms offenders (46.3%)".[5]

- "Firearms offenders recidivated more quickly than non-firearms offenders. Of the firearms offenders who recidivated, the median time from release to the first recidivism event was 17 months. Comparatively, the median time from release to the first recidivism event for non-firearms offenders was 22 months."[6]

- "A greater percentage of firearms offenders were rearrested for serious crimes than non-firearms offenders. Of the firearms offenders who recidivated, assault was the most serious new charge for 29.0 percent, followed by drug trafficking (13.5%) and public order crimes (12.6%). Of the non-firearms offenders who recidivated, assault was the most common new charge for 21.9 percent, followed by public order crimes (19.4%) and drug trafficking (11.1%)."[7]

- "Firearms offenders have higher recidivism rates than non-firearms offenders in every Criminal History Category. The difference in recidivism rates between firearms and non-firearms offenders is most pronounced in Criminal History Category I, the lowest Criminal History Category, where firearms offenders recidivated at a rate approximately 12 percentage points higher than non-firearms offenders (45.0% compared to 33.2%)"[8].

- "Firearms offenders appear to desist from criminal activity later in life than non-firearms offenders—firearms offenders continued to recidivate at a high rate until reaching age 50 at the time of release from prison. Even after age 50, firearms offenders recidivated at nearly double the rate of non-firearms offenders in the same age group".[9]

Defendant is within the group of offenders most likely to recidivate. He is a firearm offender, of young age, and with a low criminal history. Despite his low CHC, he was under court

---

[4] *See* U.S. Sentencing Commission, *Recidivism Among Federal Firearms Offenders* (June 2019) available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190627_Recidivism_Firearms.pdf
[5] *Id*. at p. 4.
[6] *Id*.
[7] *Id*.
[8] *Id*.
[9] *Id*. at p. 48.

supervision as part of a prior juvenile case and a prior diversion program. Still, Defendant is before the Court on new and very serious offenses.

VII.　Conclusion

After due consideration of the relevant factors enumerated in 18 U.S.C. § 3553(a), and in accordance with the Plea Agreement, the United States recommends a sentence of imprisonment of 72 months as to Count Two and 18 months as to Count Three. **That is, the United States recommend a total imprisonment sentence of 90 months.** The United States requests a supervised release term of five years to follow.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this March 9, 2022.

W. STEPHEN MULDROW
UNITED STATES ATTORNEY

*s/ Jeanette M. Collazo-Ortiz*
Jeanette M. Collazo-Ortiz, 226803
Assistant United States Attorney
United States Attorney's Office
Torre Chardon, Suite 1201
350 Carlos Chardon Ave.
San Juan, PR 00918

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*s/ Jeanette M. Collazo-Ortiz*
Jeanette M. Collazo-Ortiz, 226803
Assistant United States Attorney